Filed 11/17/21  In re J.G. CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re J. G. et al., Persons Coming Under the Juvenile Court Law. | B309842 |
| | (Los Angeles County  Super. Ct. Nos.  19CCJP06470,  19CCJP06470A-E) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,

        Plaintiff and Respondent,

        v.

 E.M., et al.,

        Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County, Jana M. Seng, Judge.  Affirmed.

William Hook, under appointment by the Court of Appeal, for Defendant and Appellant E. M.

Christopher R. Booth, under appointment by the Court of Appeal for Defendant and Appellant C.G.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant Deputy County Counsel, Navid Nakhjavani, Deputy County Counsel for Plaintiff and Respondent.

---

## INTRODUCTION

E.M. (mother) and C.G. (father) appeal the juvenile court's disposition order removing the couple's four children from mother's care. The family came to the attention of the Los Angeles County Department of Children and Family Services (DCFS) after the children's minor cousin reported that father sent her sexually explicit text messages. The children were detained from father and placed with mother. For the next several months, mother told DCFS that she did not know where father was. As it turned out, however, mother, father, and the children were living together. Mother did not restrict father's access to the children, and she coached the children to lie to the social workers about being with father. The children were then detained from mother as well.

By the time of the jurisdiction and disposition hearing nearly a year after the case began, mother had become more compliant with DCFS, and she had completed most of her court-ordered programs. The court exercised jurisdiction over the children under Welfare and Institutions Code, section 300, subdivisions (b)(1) and (d),[1] based in part on a finding that

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

mother failed to protect the children. The court ordered the children to remain detained from mother while family reunification services continued. Mother and father both appeal the disposition order, asserting that the children should have been released into mother's care. We find the order was supported by substantial evidence, and affirm.

## BACKGROUND

A.    *Detention from father*

In September 2019, mother and father lived in maternal grandmother's home along with their four children, four-year-old J; three-year-old S.; two-year-old M.; and one-month-old C., as well as mother's 10-year-old daughter, A. A.'s father, C.M., lived in another location and maintained weekend visitation with A. Disposition as to A. is not at issue in this appeal.

On September 3, 2019, DCFS received a report to the child abuse protection hotline. The reporter stated that father "was sexually advancing toward a child," the children's cousin, Sh., who also lived in the maternal grandmother's home. The reporter stated that the text messages from father to Sh. referenced her "booty shorts"; asked if she was a virgin or a "freak"; asked, "do you want to fuck?"; and included a photograph of his penis. The reporter said that in the past, father had engaged in similar actions with a maternal aunt; maternal uncle had warned mother "of [father's] sexual tendencies," but mother ignored the warnings. The reporter expressed a concern that A., who was not related to father, could be a target for grooming.

Children's social workers (CSWs) visited maternal grandmother's home on September 5, 2019 to investigate the allegation. Mother, father, and the children were no longer living in the home. A CSW returned to the home on September 9 and

3

spoke with maternal grandmother. Maternal grandmother said the family had stayed with her for about two weeks after mother had given birth to C. and the family had no place else to stay. Maternal grandmother said once she became aware of "the incident," she told mother and father to leave her home. Maternal grandmother said she and father do not have a good relationship because of "past family issues."

On September 9, 2019, a CSW went to A.'s school to interview her. A. was in 5th grade; she appeared clean and well-groomed. A said she was aware father and 15-year-old Sh. were sending inappropriate text messages to each other; A. overheard mother saying that the text messages were bad or dirty. A. said maternal grandmother told the family they had to leave the home. A. reported that she never felt uncomfortable with father, and he had never said anything inappropriate to her. A. reported no other concerns regarding either father or mother.

When the CSW asked A. when she had last seen father, A. said she had not seen him since they left maternal grandmother's home. But when the CSW asked A. if she was being truthful, A. admitted she was not; mother told her that if anyone asked, she should say that she had not seen father. In fact, father was staying with the family at a motel, and she had seen him the previous night.

The CSW spoke with mother at the motel where the family was staying. Mother said she understood the allegations that had been made, but "she was confused. Mother said when she spoke to the police, they informed her the text messages were 'not that bad.'" Mother said father used her phone to send the text messages, but he had deleted them. When mother asked father why he sent the texts, he said he did not know or remember why.

Mother said she did not know what to believe.  Mother and the children stayed for four days in a motel; after that, she felt bad that father did not have a place to stay, so she let him come and stay with her and the children.  Mother did not have any concerns about father being around the children.  When asked about father's inappropriate texts to the maternal aunt, mother said the aunt and father were both adults at the time, the text messages were consensual, and mother and father "had a discussion about it and decided to work things out."  Mother agreed not to allow father to return to the motel for the time being.

The CSW observed that the four younger children were clean and appropriately dressed.  Four-year-old J. told the CSW that the family had been staying in motels, and he sees father at night.  J. said he felt safe with father.

Father went to a DCFS office to speak with the CSW on September 16, 2019.  Father said the allegations were false.  He noted that mother's phone was used to send the text messages, and said other people had access to the phone.  He denied sending pictures of his genitals to Sh.  Father said he did not know why someone would accuse him of sending the texts.  When asked about the text messages to maternal aunt, father said the family had set him up.  Father said he and maternal aunt were texting; maternal aunt then asked him for money and when he declined, "he was exposed" to mother.

Father said that after maternal grandmother asked the family to leave her home, mother and father decided that father would "go his separate way."  Father said he had not seen the children since the previous week; he denied he was staying with mother and the children.

5

The CSW spoke with A.'s father, C.M., on September 15, 2019. C.M. said that based on his informal custody arrangement with mother, he picks up A. on Fridays and returns her to mother on Sunday afternoons. C.M. said he did not have any concerns about A. being in the care of mother or father. He noted that mother's family did not like father, and suggested father may have been set up.

On October 1, 2019, the juvenile court issued a removal order to detain the children from father and place them with mother. DCFS stated in the detention report, "Although there are concerns regarding the mother's ability to protect, it is the Department's assessment that home of parent, mother remains the most appropriate plan for the children at this time. However, court and DCFS involvement and supervision is [*sic*] essential to ameliorate the risk to the children, as without intervention, the risk would be significant."

DCFS included photos of the text message exchanges between father and Sh. Father included several requests that Sh. not reveal that he was texting her and to delete the messages. When Sh. asked why, father responded, "Cus ur a minor I mean we not saying anything bad but yeah u know." Father asked, "What's up with you and them booty shorts tho lol." Another message stated, "If I was younger or you were into older dudes I'll definitely holler at u.. just saying." Father said that he and mother were "always fighting" and that they were "taking a break." He also said, "Just thought you looked bomb asf," and "Damn why you teasing me like that girl lol passing right in front of me you know I'm looking." Father asked, "Are u a freak?" and said, "Just saying lol idk like you would be down for anything if it. Came down to it . . . And you'd be good at it." Father told Sh.,

6

"you look good," and "You're really cute as[ ]well."  Father asked, "U still a virgin?" After Sh. answered, "Nah," father said, "Knew it . . ."  "You down to do some shit or what?"  "I could tell when a girl had gotten fucked before."  He also told Sh., "U have that dirty lil naughty voice" "and laugh."  He then asked, "So what u down to [penis emoticon] Fuck?????????"  Sh. responded, "N nah."

On October 4, 2019, DCFS filed a juvenile dependency petition under section 300, subdivisions (b)(1) and (d).[2] Counts b-1 and d-1 alleged that father "sexually abused the children's minor cousin" by sending Sh. sexually explicit text messages and telling her not to tell anyone.  Both counts further alleged that mother "failed to demonstrate a protective capacity and refuses to believe the minor cousin," and allowed father "unlimited access" to the children.  In addition, both counts alleged that C.M. failed to protect A. by "refus[ing] to believe the minor cousin" and allowing A. to continue living with father.  The two counts alleged that the parents' actions placed the children at risk of serious physical harm, damage, and sexual abuse.

---

[2] Section 300, subdivision (b)(1) allows for jurisdiction over a child when the "there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, or the willful or negligent failure of the child's parent or guardian to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left . . . ."  Subdivision (d) allows for jurisdiction when "there is a substantial risk that the child will be sexually abused, as defined in Section 11165.1 of the Penal Code, by his or her parent or guardian or a member of his or her household, or the parent or guardian has failed to adequately protect the child from sexual abuse when the parent or guardian knew or reasonably should have known that the child was in danger of sexual abuse."

At the detention hearing on October 7, 2019, the juvenile court ordered the children detained from father and released to mother.[3] For mother, the court ordered individual and family counseling, sex abuse awareness counseling, and parenting classes. For father, the court ordered individual counseling, a sex abuse education program, and parenting classes. The court ordered monitored visitation for father; mother could not be the monitor.

The jurisdiction/disposition report filed November 12, 2019 stated that a CSW spoke with mother by phone on November 5. Mother was living in a motel and looking for permanent housing; she was unemployed and receiving financial assistance. Regarding the allegations against father, mother said, "I have not talked to [father] to ask him what happened or about the details that were presented in Court. I read the text messages sent to [Sh.] from my telephone. I honestly do not know what to believe. All I know is that I am not in a relationship with [father] since this situation started because I want to protect my children." Mother said she wanted to continue a relationship with father "because we have our children in common." She also said that father had not seen the children since the last court date, October 7, 2019. Mother agreed to bring the children to the DCFS office for an interview the following day, but she did not show up and did not respond to text messages. Father also did not respond to the CSW's attempts to contact him.

The CSW interviewed Sh., who lived with her mother and stepfather in maternal grandmother's home. Sh.'s stepfather was maternal grandmother's son and mother's brother. Sh. said that in September 2019, she received a message from mother's

_____

[3] A. was released to both parents, mother and C.M.

phone saying it was father texting her. She told the CSW about some of the messages father sent, and said he texted a picture of his penis from mother's phone and from another phone. Sh. said she deleted the photo because she did not want it on her phone. Sh. said, "His messages scared me and made me feel uncomfortable. I ignored his text messages." Sh. said she told her mother two days later, and her mother revealed that father had also texted "sexual things" to her before. Sh. said she knew it was father texting her, because she saw mother's phone in his hands during the text conversation.

DCFS stated that "mother continues to demonstrate her ability to protect her children as she reported to have no contact with" father. DCFS stated that a home of parent order "remains the most appropriate plan for the children at this time. However, DCFS seeks Court involvement and supervision to ameliorate the risk to the children. . . ." DCFS noted that mother had not yet enrolled in any counseling or classes.

B.     *Detention from mother*

The jurisdiction hearing was continued to January 29, 2020. A supplemental report filed before the hearing stated that mother had not started parenting classes because she was on a waiting list with one agency and had not been successful in enrolling at other agencies. Mother was still living in motels; she reported she was having trouble finding an apartment that would accept five children. Mother was working in the evenings, and a paternal aunt was watching the children while she worked. Despite DCFS's requests, mother had not provided any information about the paternal aunt. Mother had not yet enrolled the children in family counseling and the children's medical and dental exams were overdue. DCFS also noted that

"mother refuses to follow up with housing and shelter referrals provided by DCFS."

On January 23, 2020, C.M. told the CSW that mother was leaving A. with paternal grandmother for days at a time. C.M. said A. had lice, and mother "will not do anything to resolve that issue." He also said mother and father had recently purchased a new car, and three weeks earlier he saw father in the car with mother and the children. A. reported that father told mother to "get rid of" A. C.M. expressed concern that mother's instability was making A. feel unstable, and he asked to have full custody of A.

DCFS's efforts to contact father were unsuccessful. On January 10, mother said the last time she had seen father was on December 23 during a monitored visit with the CSWs. However, DCFS noted C.M.'s statements saying he saw the children with father, and noted that in one interview, J. said, without prompting, "I haven't [seen] my dad," then he "looks to mother for approval after he makes the statement about not seeing his father." DCFS stated that it "is concerned that mother is allowing father . . . to have unlimited contact with the children" and that mother coached the children into saying they had not seen father. DCFS recommended that the children be detained from mother, that C.M. be given sole custody of A., and that parents have monitored visitation with the other four children.

On January 29, 2020, the juvenile court continued the jurisdiction hearing to April 15, 2020. On February 6, DCFS filed a request for an order to remove the children from mother's custody, citing concerns about mother allowing father access to the children, mother's unstable housing, and mother's failure to enroll in any programs. DCFS noted that mother and the

10

children had been homeless since October 2019, and despite repeated offers of housing assistance, mother continued to move from motel to motel. DCFS also noted that at a visit on January 23 the CSW observed that the children had lice; mother said she uses a lice brush on the children. In addition, DCFS reiterated C.M.'s concerns about A. and the children's contact with father. The juvenile court signed a detention order removing the children from mother's care the same day, February 6, 2020.

On February 11, 2020, DCFS filed a section 385 petition seeking to vacate the home-of-parent order for mother. A detention report filed the same day stated that A. was living with C.M. and the other children were in foster care. The report stated that on February 7, the day CSWs removed the children from mother's care, "[A.] reported that she had not been honest with CSW, as when she was with mother they don't sleep in Motels every night. [A.] reported that they only sleep in Motels when CSW has an appointment with mother and the children. [A.] reported that mother and [father] usually park at a storage parking lot and sleep in the car. [A.] said they park at the 'Extra Space Storage' and it is very dark and scar[y] when the lights go out." The CSW asked why A. had not told her this before, and A. said mother warned that the children would be taken away and placed in foster care if A. told the truth, so she "kept quiet because she was scare[d]." A. said that "if her brothers and sister smell like poop [it] is because they don't take showers or get cleaned in a long time." A. also said that father "has always been with them . . . and sleeps with the family in the car." A. said every time mother had an appointment with the CSW, father would leave; when the appointment was over, mother would call father and say, "you can come back, she left." A. also told the

11

CSW about father telling mother to "get rid of" A.; A. and C.M. filed a report with the sheriff's department regarding this statement. A. also said she could not see out of her left eye, but mother had not taken her to a doctor to have it checked.

A second CSW who assisted with transporting the children on February 7 noted that J. "was scratching his head desperately." J. told the CSW, "I have little animals [on] my head. It itches when they wake up, but it doesn't itch when they are asleep." J. said mother takes off the animals but they come back. J. also reported sleeping in the car with the family, including father, at the storage facility. The CSW noted that S. was dirty and not well-groomed, and she also had lice. The children's clothing was dirty and had a strong odor.

On February 7, maternal grandmother said she could not care for the children because she was recovering from surgery and was using a wheelchair. DCFS noted that "on numerous occasions she asked mother to come and stay in [maternal grandmother's] house with the children, as maternal grandmother has an extra bedroom. However, maternal grandmother stated that mother refused."

DCFS reported that father still had not responded to any attempts to contact him, and mother claimed to not know where he was. Mother was not in compliance with the case plan or court orders; she had not enrolled in any classes or therapy. DCFS's assessment "clearly indicated that the family was at High Risk for child abuse/neglect and the care of the children . . . is compromised under the care of the father." DCFS also stated, "There is substantial evidence that a parent, guardian, or custodian of the child is likely to flee the jurisdiction of the court."

At the section 385 hearing on February 13, 2020, mother's counsel argued that this was "a family law issue," because A.'s father, C.M., "is making up allegations regarding the mother and [father] because he wants full custody, and the mother refuses to give him full custody." Mother also submitted evidence that some of the children had received medical and dental care. Mother's counsel also argued that mother "denies that [father] has seen the children. The children deny that as well." Minors' counsel pointed out that mother's contentions did not reflect the facts, the children had been sleeping in the car with mother and father, and A. "herself notes that she was being coached by mother."

The court granted the section 385 petition, finding that mother had allowed father "unsupervised access to the children," and that mother failed to provide for the needs of the children "despite the numerous opportunities provided by the department social worker." The court ordered A. to be released to C.M., and that placement be secured for the remaining children. The court further ordered that mother have monitored visitation.

C.    *Jurisdiction and disposition*

A supplemental report filed June 19, 2020 stated that A. continued to live with C.M. and the other four children remained in foster care. In April 2020, a CSW visited A. at C.M.'s home. A. reported that although she attempts to call mother, mother does not respond. DCFS had no concerns about C.M., and recommended that he be stricken from the petition.

In May 2020, mother and father attended a child-family team meeting by phone. Mother and father stated that their goal was to reunify with the children. DCFS noted that mother and father "appear to be motivated to do better in their lives for their children." The foster parents noted that mother and father were

affectionate and loving during visits. The report did not include clear information about the parents' housing situation or whether parents had enrolled in any services.

DCFS recommended that the section 300 petition be sustained. It further recommended that A. be released to the custody of C.M., and jurisdiction over her terminated with a family law order granting C.M. sole legal and physical custody. With respect to the remaining children, DCFS recommended that reunification services be provided, not to exceed six months.

The adjudication hearing was continued several times. On August 5, 2020, DCFS filed a last-minute information stating that mother completed a parenting education program on June 25. DCFS's recommendations regarding the children remained the same.

A last-minute information filed August 28, 2020 stated that mother and father had a new home. The CSW noted that the home was "clean with a few boxes in the kitchen. Mother stated that they are working towards organizing the home and are currently working on the children's bunkbeds." Mother had enrolled in individual counseling and was on a waiting list for sexual abuse awareness classes. Father said he had started parenting classes but he was "dropped from" the course due to his inconsistent attendance. He was planning to call to see if the program would allow him to re-enroll. Father had not enrolled in individual counseling or sexual abuse awareness classes. The last-minute information included a sheriff's department report from August 28, 2019, which was generated after Sh. reported that father sent her the sexual text messages. The sheriff's report noted the allegations, noted that Sh. and her brother

14

reported they had not been touched inappropriately, and stated there was "no evidence of a crime."

A last-minute information filed September 11, 2020 included statements from father regarding the allegations in the petition. Father said he never texted Sh.: "It never happened. It was somebody else who texted her pretending to be me. I don't know who texted her pretending to be me." Father also said, "I feel this whole situation was set up by [Sh.'s] mother . . . and her stepfather" because "[i]n the past, [Sh.'s mother] and I spoke and texted each other with sexualized messages." Father thought that Sh.'s stepfather "tried retaliating against me because he found out [that Sh.'s mother] and I were communicating in a sexual manner." Father said that after the family left maternal grandmother's home, they were homeless. When paying for motels became too expensive, the family slept in the car. Father said a previous CSW on the case told him that he, mother, and the children could stay together.

A last-minute information dated November 18, 2020 stated that mother completed a child sexual abuse awareness course on November 9, 2020. Mother had also enrolled in individual counseling and had completed two sessions. Father had not enrolled in any services. DCFS recommended that reunification services continue, stating that it "continues to have concerns regarding mother's ability to be protective of her young children who are of tender age." Father said he moved out of mother's apartment in October and was sleeping in a car; mother said she was still financially dependent on father. Mother also "considers [father to be] her source of emotional and financial support." DCFS expressed concern that if the children were released to mother, "she will allow father to have full access to the children."

15

DCFS asked the court to declare the children dependents of the court and allow DCFS to liberalize visitation with parents as warranted. DCFS also asked that A. be released to C.M., and jurisdiction over her be terminated with a family law order granting C.M. sole legal and physical custody. In a last-minute information filed November 20, 2020, DCFS recommended that mother have unmonitored visitation with the children, and that mother be ordered to continue individual counseling.

At the jurisdiction/disposition hearing on November 23, 2020, the parties did not submit any additional evidence. The minors' counsel asked that count d-1 be sustained, stating that father's actions of "soliciting sexual activity" from the children's minor cousin constituted sexual abuse under section 300, subdivision (d). Minors' counsel also argued that "[t]his was a pretty egregious case of mother failing to protect," because even after reading the text messages, mother said she did not know what to believe. Moreover, throughout the case mother allowed father contact with the children and encouraged the children to lie to DCFS. Minors' counsel stated that although mother had completed some of the court-ordered programs, "I think we need to take this slow and see that the class worked and that mom will be protective of the kids."

Mother's counsel asked that the petition be dismissed, or that mother be stricken from the petition and be deemed non-offending because "[t]here's no evidence of current risk." Mother's counsel said there was no evidence of any further incidents concerning father, and "[m]other and father have separated. Mother no longer lives with father." Mother's counsel also said mother was willing to comply with all DCFS requirements.

Father's counsel argued that Sh. "is not a child, per se. It is somebody who is a minor who is protected by the statute that disallowed sexual relations between an adult and somebody under 18. You could hardly say that a developed teenager – an interest in a developed teenager is an unnatural or abnormal sexual interest." Father's counsel continued, "[Father's] inelegant request for asking for [*sic*] sex and his other conduct here does not rise to the level of sex abuse pursuant to 300(d) and the criminal code to which it refers."

DCFS's counsel joined the arguments of minors' counsel, and asked the court to sustain both counts. DCFS's counsel noted that father and Sh. were family members, and father told Sh. not to disclose his actions to anyone, so "the concern of the department is the threatening environment and the threat to not tell and to not disclose." In addition, while the case was pending, mother had been dishonest with DCFS and coached the children to lie about their contact with father, showing "that at this time there is a risk, a substantial one, posed by mother's behavior." DCFS's counsel also noted that mother continued to maintain contact with father, and father had not made any progress with respect to the case plan. DCFS also requested that C.M. be dismissed from the petition.

The court dismissed C.M. from the petition and sustained the remainder, finding that father's actions met the definition of sexual abuse under section 300, subdivision (d). The court also stated that mother refusing to believe that the incident occurred and allowing father to continue contact with the children constituted a failure to protect. The court therefore found the children to be persons described by section 300, subdivisions (b)(1) and (d).

17

Regarding disposition, mother did not object to the plan to award custody of A. to C.M., with unmonitored visitation as long as father was not present. As to the younger children, mother's counsel asked that the children be released back into mother's care, or if the court ordered the children to remain in foster care, unmonitored visitation. Father's counsel argued that requiring father to complete a sexual abuse program for perpetrators was "wrongheaded," because "[t]hat course is for people who have a problem being attracted to children." The minors' counsel asked that the children remain in foster care, and to "slowly liberalize, given the extent of how mother was lying to the department and allowing [father] around."

The court found that placing the children in mother's home would be detrimental to the welfare of the children, and would present a substantial danger to the children. For the four younger children, the court ordered unmonitored visitation for mother, monitored visitation for father, and continued family reunification services. The court terminated jurisdiction over A. with an exit order providing for joint legal custody, full physical custody to C.M., and unmonitored visitation with mother with the requirement that father not be present.

Mother and father each timely appealed.

## DISCUSSION

Mother asserts that the juvenile court's disposition order as to the four youngest children was erroneous because "the evidence showed [the children] would not be in any danger if placed with her since she had already completed a sexual abuse awareness program, parenting classes, and was no longer living with father." Father joins mother's arguments. DCFS asserts

18

that the juvenile court's order was supported by substantial evidence.

"A juvenile court's removal order at a disposition hearing will be affirmed on appeal if it is supported by substantial evidence. [Citation.] 'Evidence sufficient to support the [juvenile] court's finding must be reasonable in nature, credible, and of solid value; it must actually be substantial proof of the essentials that the law requires in a particular case. [Citation.]" [Citation.] We consider 'the evidence in the light most favorable to respondent, giving respondent the benefit of every reasonable inference and resolving all conflicts in support of the [challenged order].'" (*In re V.L.* (2020) 54 Cal.App.5th 147, 154.)

"A dependent child shall not be taken from the physical custody of his or her parents . . . unless the juvenile court finds clear and convincing evidence" that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (§ 361, subd. (c)(1).) A child may also be removed from a parent's home if the child is "deemed to be at substantial risk of being sexually abused[ ] by a parent . . . and there are no reasonable means by which the minor can be protected from . . . a substantial risk of sexual abuse without removing the minor from his or her parent." (§ 361, subd. (c)(4).)

Mother argues that although she was "she was not protective in the beginning of the case" when she allowed father access to the children, this "was understandable under the circumstances" because mother was "confused by the allegations,"

19

as father "had denied the allegations entirely, she did not know what to think." She asserts that by the time of the jurisdiction and disposition hearing, she "was cooperating with [DCFS] and the court to protect her children," and she had completed several programs.

The record does not support mother's argument that she was confused about the situation or about the court's orders separating the children from father. To the contrary, mother's actions made clear that she knew what was expected of her, but instead she attempted to deceive DCFS by sending father away during CSW visits, renting motel rooms to mislead DCFS about the family's living situation, telling DCFS she had not seen father, and coaching the children to lie about living with father. In addition, DCFS noted that mother continued to refuse housing assistance for her and the children, both from DCFS and maternal grandmother. Mother warned A. that if she told the truth about their living situation, the children would be taken away. Thus, mother continued to stay with father despite knowing that doing so placed her at risk of losing custody of her children. Mother's actions do not suggest an innocent misunderstanding about the allegations, the case, or what was required to protect the children.

Although mother had started to comply with the case plan by the time of the jurisdiction hearing more than a year after the case was initiated, the court was not required to ignore the months of mother's failure to protect the children. (See, e.g., *In re Cole C.* (2009) 174 Cal.App.4th 900, 917 [in determining disposition, "the court may consider the parent's past conduct as well as present circumstances"].) Mother had been slow to recognize her need to protect the children, she remained

20

financially dependent on father, and father still had not obtained stable housing, suggesting an ongoing risk that mother would allow father back into the family home. While mother's progress toward the case goals was commendable, the court's decision to remove the children from mother, while allowing DCFS to continue liberalizing her visitation, was supported by the history of the case.

Mother also argues there were less drastic alternatives available, such as allowing the children to live with her and ordering services. She compares this case to *In re Steve W.* (1990) 217 Cal.App.3d 10 (*Steve W.*), in which the mother's boyfriend caused the death of one of the mother's two children. The surviving child was declared a dependent of the court under section 300 and removed from the mother's care. The mother appealed the disposition order, asserting that there was no evidence that the child was in any danger in the mother's care. (*Id.* at p. 16.) The Court of Appeal reversed. It noted that in light of the mother's past abusive relationships, the trial court's concern was "that she would enter a new relationship with yet another abusive type of person." (*Id.* at p. 22.) But because the mother was not in any relationship at the time of the hearing, any such concern was speculative, and "speculation about the mother's possible future conduct is not even sufficient to support a finding of dependency much less removal of the physical custody of the child from the parent." (*Ibid.*)

As DCFS points out, the mother in *Steve W.*, was deemed non-offending, while here mother was an offending parent. Moreover, the court in *Steve W.* emphasized that the offending parent was incarcerated and would not have access to the child. (*Steve W., supra*, 217 Cal.App.3d at p. 22.) Here, by contrast,

21

mother continued her relationship with father, who continued to deny the allegations and had not completed any of the programs ordered by the court. The reasoning of *Steve W.* is not persuasive here.

Substantial evidence supports the juvenile court's disposition order removing the children from mother's custody.

## DISPOSITION

The juvenile court's disposition order is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.

We concur:


WILLHITE, ACTING P.J.


CURREY, J.